*479 OPINION OF THE COURT
Levine, J.
Defendant was indicted and convicted after trial of the sale of two ounces, 33 grains of cocaine (a class A-I felony) to an undercover police officer on August 31, 1988. The trial testimony established that, in a known drug location, defendant sold the undercover officer 214 vials of cocaine for $2,000 and promised to "take care of’ him "the next time” he came. At the time of the sale she was 17 years old. Conviction of a class A-I felony carries a mandatory indeterminate prison sentence, the minimum of which is not less than 15 years and not more than 25 years, the maximum of which is life imprisonment (Penal Law § 70.00 [2] [a]; [3] [a] [i]). The trial court, however, determined that in defendant’s case, imposing even the minimum mandatory sentence of 15 years to life would constitute cruel and unusual punishment (US Const 8th Amend; NY Const, art I, § 5). The court, therefore, imposed an indeterminate sentence of eight years to life imprisonment. A divided Appellate Division affirmed (190 AD2d 162), the dissenters voting to reverse the sentence and remand the case to Supreme Court for resentencing in compliance with the Penal Law’s mandatory sentencing provisions for an A-I felony conviction. A Justice of the Appellate Division granted the People’s application for leave to appeal, and we now reverse.
In People v Broadie (37 NY2d 100, cert denied 423 US 950), this Court in an opinion by Chief Judge Breitel, albeit not without doubts expressed regarding the wisdom of the severity of the sentencing scheme for drug offenses enacted in 1973 (L 1973, ohs 276-278), upheld the facial and as applied validity of the mandatory maximum life imprisonment sentence and various mandatory minimum prison sentences in that legislation as against challenges under the cruel and unusual punishment prohibitions of the State and Federal Constitutions. In Broadie, this Court adopted the principle that a sentence may constitute cruel and unusual punishment by being " 'cruelly’ excessive, that is, grossly disproportionate to the crime for which [it is] exacted” (37 NY2d, at 125 [citations omitted]; see also, id., at 111). A majority of the Justices of the United States Supreme Court, in Harmelin v Michigan (501 US 957), reaffirmed the same principle, that gross disproportionality of a sentence of imprisonment violates the Eighth Amendment’s Cruel and Unusual Punishments Clause (id., 501 US, at 997-998 [Kennedy, J., concurring with O’Connor *480 and Souter, JJ.]; id., 501 US, at 1013-1016 [White, J., dissenting with Blackmun and Stevens, JJ.]; see also, Solem v Helm, 463 US 277, 289-290; Weems v United States, 217 US 349, 377).
In assessing the proportionality of the mandatory sentences in People v Broadie, our analysis focused on the following factors: (1) the gravity of the offense, primarily in terms of the harm it causes society, but also in comparison with punishments imposed for other crimes in this State as well as with punishments for the same or similar crimes in other jurisdictions (supra, at 112, 115); and (2) "the character of the offender and the gravity of the threat he [or she] poses to society” (id., at 113; see also, Solem v Helm, 463 US, at 290-293, supra).
In People v Broadie, we found that "[m]easured thus by the harm it inflicts upon the addict, and, through him, upon society as a whole, drug dealing in its present epidemic proportions is a grave offense of high rank” (supra, at 113 [emphasis supplied]). Although the statutory sentencing scheme at the time equated the punishment level for drug dealing with that for the most heinous crimes of violence defined in the Penal Law, this Court found such severity not to be unreasonable because "drug-related crimes may be much more prevalent, that is, have a higher and rising incidence, than other crimes comparably punished or equally grave crimes not as severely punished, requiring greater isolation and deterrence” (id., at 116).
Turning in our constitutional analysis to the character of the eight defendants whose sentences were reviewed in People v Broadie, the Court recognized that, although not all of the defendants were "hardened” criminals, each was convicted of at least "street” sales or possession of large amounts of narcotics and none was what might be described as merely an "accidental” offender; therefore, we concluded that each could reasonably be considered a serious threat to society meriting severe punishment (id., at 113-114, 117). Accordingly, in Broadie, we found none of the sentences was grossly disproportionate to the crime committed, and concluded that the mandatory imprisonment provisions for drug-related crimes withstood both the facial and as applied challenges to their constitutionality. We nonetheless cautioned that, in the future, the mandatory drug sentencing laws might present "some rare *481 case on its particular facts [where it could] be found that the statutes have been unconstitutionally applied” (id., at 119).
In People v Jones (39 NY2d 694), this Court was again called upon to determine whether the imposition of the mandatory maximum sentence of life imprisonment for a drug-related offense violated the constitutional prohibitions against cruel and unusual punishments. The defendant, a "millhand” in a large-scale heroin packaging and distribution operation, was arrested in a January 1970 raid and charged with joint possession (with 14 others) of over four pounds of heroin seized in the raid. She was offered (as were the other millhands) an opportunity to plead guilty to a lesser offense with a one-to-three-year sentence. She declined the offer and was found guilty after trial. A majority of this Court ruled that the mandatory sentence she received did not constitute cruel and unusual punishment. In so ruling, the majority rejected the dissent’s conclusion that the marked discrepancy between her sentence and the sentence meted out to the other millhands, who had accepted the prosecution’s plea proposal, constituted cruel and unusual punishment because it presented such a gross violation of the principle of equality of treatment for equally culpable offenders and had the effect of penalizing the defendant for exercising her right to a trial.
We last measured mandatory sentences for drug selling and possession against the constitutional proscriptions of cruel and unusual punishments in People v Donovan (59 NY2d 834, affg 89 AD2d 968). As disclosed in the dissenting memorandum of Presiding Justice Milton Mollen at the Appellate Division (89 AD2d, at 968-971, supra), the defendant was convicted of first degree criminal sale and first degree criminal possession of a controlled substance, in connection with the sale of just under four ounces of cocaine by her boyfriend, a narcotics dealer, to an undercover officer. Defendant’s involvement in the transaction was in procuring the drugs, apparently without personal profit, at her boyfriend’s behest (the presentence report stated that the offense was "out of character” for her). She rejected an offer of a one-to-three-year sentence in exchange for a plea to a lesser offense. Her conviction after trial resulted in the imposition of the minimum mandatory sentence, 15 years to life imprisonment, while her boyfriend, the principal actor in the transaction, received a sentence of lifetime probation for subsequently cooperating with the authorities. We again rejected the defendant’s cruel and unusual punishment claim (People v Donovan, 59 NY2d, at 836, supra).
*482 Considered in light of the analysis developed in our own and Supreme Court precedents, we must conclude that the constitutional prohibitions against cruel and unusual punishments were not transgressed on the record and facts of this case. Manifestly, the Legislature may constitutionally define criminal punishments without giving the courts any sentencing discretion (Chapman v United States, 500 US 453, 466-467). Even the most severe mandatory sentences may be fixed for sale or even possession of quantities of cocaine so large as to support the inference that they were held for purposes of sale, because of the pernicious effect of drug trafficking on society (Harmelin v Michigan, 501 US 957, 1001-1003, supra). Thus, in Harmelin, the majority of the Supreme Court upheld a mandatory sentence of life imprisonment without parole for possession of over 650 grams of cocaine. Indeed, the most salient factor cited by the dissenting Justices in voting to overturn the mandated sentence was the absence of any possibility of parole for the lifetime of the offender, a result the dissenters found only permissible if the conduct was "so atrocious that society’s interest in deterrence and retribution wholly outweighs” all other penological considerations of individualized treatment in every case (id., 501 US, at 1028 [Stevens, J., dissenting]; see, 501 US, at 1022-1023 [White, J., dissenting]). By contrast, the sentence mandated here would authorize parole after service of the minimum term of imprisonment.
Considering the first element of the Broadie cruel and unusual punishments analysis, time has not eroded this Court’s conclusion in Broadie that the selling of narcotic drugs represents a grave offense of the first magnitude. Neither has it altered our conclusion on the second element, that, in comparison to the sanctions for other crimes under our Penal Law and for the same or similar drug offenses in other jurisdictions, the mandatory sentences for drug offenses are "relatively severe, but not irrationally so, given the epidemic dimensions of the problem” (People v Broadie, 37 NY2d 100, 117, supra).
To complete our analysis to determine whether defendant established the gross disproportionality of her punishment, we examine the extent of her culpability in this cocaine sale and the threat she poses to society (see, id., at 113; Solem v Helm, 463 US 277, 293, supra). The undisputed evidence in this regard is not overly favorable to defendant. The undercover *483 officer testified at the trial without contradiction that defendant made a direct sale to him, filling his order for 200 vials of cocaine for a price of $2,000 and then knowledgeably haggled with him over the amount of the customary bonus of additional vials, insisting on giving him only 14 over his claim of entitlement to 20 extra vials, but promising to "take care of’ him personally "the next time” he came. Her conduct hardly bore the earmark of an "accidental” offender (People v Broadie, supra, at 113). As the Trial Judge noted at sentencing, defendant "understood fully well what she was involved in”. It is noteworthy in this respect that in Broadie, Chief Judge Breitel expressly held that "[n]one of the present cases involve what are often called 'accidental’ offenders * * * [because each of the eight defendants] was convicted of at least 'street’ sales of heroin or cocaine, or possession of a large amount of narcotics” (id., at 113). Undeniably here, the sale of 214 vials of cocaine for $2,000 was, at the very least, at one higher level of culpability (and risk to society) than the street sales in Broadie. Moreover, defendant’s election to personally sell a requested significant quantity of drugs at the wholesale level is to be completely contrasted with the conduct of the defendant in People v Jones (39 NY2d 694, supra). In Jones, the defendant was a "millhand” at the very lowest level of the heirarchy of the illegal drug enterprise, packaging the drugs. She was convicted of joint constructive possession of the four pounds of heroin found by the police at the premises during the raid. As a minor functionary in the enterprise, obviously the defendant in Jones had no actual control over the quantity of drugs that happened to be on the premises at any one time and, in that sense, Chief Judge Breitel in dissent could well characterize her as "perhaps an accidental” (id., at 701) offender as to the commission of a level of criminal possession of a dangerous drug dependent upon the quantity of the drugs possessed. In this case, despite the Trial Judge’s expressed certainty, based upon the evidence at trial, that defendant was in fact guilty as charged, defendant never accepted any personal responsibility for her criminal behavior nor expressed any remorse.
Moreover, we find no record support in the trial transcript or the presentence report of even a claim by defendant, much less evidence, that defendant’s criminal involvement was due to the domination of or coercion by her uncle, the principal in the drug operation in which defendant’s sale took place. Indeed, it was the conclusion of the probation officer who *484 performed the presentence investigation that defendant’s involvement in the offense was motivated by a desire "to obtain personal profit”. That conclusion was derived in part from the officer’s interview with defendant, which was a good "vantage point to draw inferences, characterizations and interpretations from the record” (dissenting opn, at 491), particularly since defendant did not testify at the trial.
Nor does the punishment her uncle received establish gross disproportionality. He was indicted, inter alla, for five criminal sales of a controlled substance in the first degree, and pleaded guilty to one such sale in a plea bargain under which he was sentenced to 15 years to life imprisonment. While undoubtedly his far greater culpability merited substantially more punishment than defendant received, the comparative leniency in treatment of defendant’s uncle is significantly less than that objected to in People v Jones (supra) and People v Donovan (supra). And, even in those cases, the disparity in punishment was not sufficient to establish gross disproportionality.
Although defendant’s presentence report discloses mitigating factors in her family history, they do not demonstrate such an exceptional level of childhood deprivation that would significantly excuse her behavior. Defendant informed the probation officer who conducted the presentence investigation that "she received adequate supervision and that the quality of the home was decent” during most of her formative years when she was raised by a grandmother in Jamaica, British West Indies.
All of the foregoing factors militate against finding that defendant is the rare case we envisaged in Broadie that, on its particular facts, would present an exception to the general facial constitutionality of the Penal Law’s mandatory sentencing provisions for drug-related offenses. Indeed, based on our assessment of the gravity of the offense she committed and her personal culpability, we could only find defendant’s mandated sentence cruel and unusual punishment by concluding that the constitutional prohibitions prevented mandatory imprisonment for all offenders of defendant’s age. Yet the Legislature has consciously extended the A-I felony mandatory mínimums to youths in defendant’s age category (see, CPL 720.10 [2] [a]; see also, CPL 220.10 [5]; Schwartz, Preface to Chart V, NY Sentencing Charts 1994 Edition, Pamphlet to McKinney’s Cons Laws of NY, Book 39, Penal Law, at 18-19). *485 The prevalence of the employment of adolescents to market illegal drugs is now well recognized (see, Letwin, Report From, the Front Line: The Bennett Plan, Street-Level Drug Enforcement in New York City and the Legalization Debate, 18 Hofstra L Rev 795, 813 [1990] [see, sources cited therein]). Thus, the Legislature could rationally determine that teenage drug dealers pose a serious threat to society. Clearly, defendant has not met her burden of showing any objective basis for us to conclude that contemporary standards of decency prevent imposing a sentence of 15 years to life imprisonment upon an older adolescent for a direct volitional sale of more than two ounces of cocaine for $2,000 (see, Stanford v Kentucky, 492 US 361, 380-382 [O’Connor, J., concurring], 383-384 [Brennan, J., dissenting]; Trop v Dulles, 356 US 86, 100-101; see also, Hutto v Davis, 454 US 370; Terrebonne v Butler, 848 F2d 500, cert denied 489 US 1020).
Before concluding this opinion, it is appropriate to address the principal arguments of the dissent urging affirmance. The dissent takes us to task for failing to set forth cruel and unusual punishments criteria for the guidance of sentencing and intermediate appellate courts, and for "overturning the opposite views of both prior courts, effectively rendering] a first instance judgment that an Eighth Amendment transgression and the Broadie rare case exception are not present.” (Dissenting opn, at 495.)
In reviewing the as applied constitutionality of the sentencing statute in this case, we considered the gravity of defendant’s crime, that is, the harm it causes society and its comparative seriousness in light of the punishments for other State crimes and for the same offense in other jurisdictions, as well as in comparison to the punishment of the other charged participant. We also reviewed defendant’s personal history and her role in the commission of this criminal offense, and found no strongly mitigating factors, other than her youth, which we determined was alone insufficient to establish gross disproportionality for constitutional purposes.
The foregoing factors were essentially those set forth by Chief Judge Breitel in People v Broadie (37 NY2d 100, 113, supra). They were also the same factors applied in Solem v Helm (463 US 277, 290-293, supra), the most recent case in which the Supreme Court struck down a mandatory sentencing law. And they were the factors applied in the proportionality analysis of the dissenters in Harmelin v Michigan (501 *486 US 957, 1018-1027, supra [White, J., dissenting]), the most recent case in which the Supreme Court reviewed (and then uphéld) a mandatory sentencing scheme.
The Broadie-Solem analysis is designed to furnish an objective, principled basis for review of sentencing claimed to violate the cruel and unusual punishments clauses (see, Harmelin v Michigan, 501 US, at 1018-1021, supra [White, J., dissenting]). For the same reason, in Broadie, Chief Judge Breitel adopted that analysis in place of "a subjective evaluation which looks to the extent to which the conscience of the court is shocked by punishments imposed” (37 NY2d, at 111, supra [emphasis supplied]).
The Broadie-Solem criteria pay due deference to the preeminent role of the Legislature in choosing penological objectives. In Broadie, despite expressing policy misgivings, Chief Judge Breitel acknowledged that the Legislature could validly adopt deterrence — through wide severity of punishment — as the supervening objective in fashioning a statutory framework for drug crime control:
"Thus, to achieve the deterrence, so far seemingly elusive, the would-be drug trafficker had to be put on notice that, should he be caught, his fate was sealed regardless of his position in the heirarchy of distribution and regardless of the quantity of drugs in which he dealt” (id., at 115).
The dissent’s suggested alternative mode of cruel and unusual punishments review dispenses with comparative proportionality analysis as a principal means of insuring objectivity in deciding the constitutionality of sentences and restricting discretionary adjudication in this area. The dissent appears to limit the role of comparative proportionality assessment to determining "whether a sentence less than the most severe mandatory variety would deprecate the seriousness of the particular crime in general, in relation to other participants charged and uncharged, and in relation to other serious crimes of equal classification rank.” (Dissenting opn, at 497.) Apart from this nod to objective standards, the dissent’s approach would have the trial court in each case consider and weigh a lengthy list of particularized factors in a "nuanced” manner (dissenting opn, at 499) typically exercised by sentencing courts under individualized, indeterminate statutory sentencing regimes.
Undoubtedly, the dissent’s approach would enlarge the dis *487 cretion of trial courts to determine that a mandated sentence in a given case was cruel and unusual punishment, based upon the sentencing court’s findings on the various particularized factors and its weighing of those factors. The dissent’s awareness of this likely effect is demonstrated in the candid statement that the suggested approach "focuses on the distribution of the power of sentencing adjudication” (dissenting opn, at 499). It, thus, impliedly rejects the proposition that indeterminate sentencing is not a constitutional imperative (see, Chapman v United States, 500 US 453, supra).
The weakening effect on the presumption of constitutionality of the dissent’s heavily discretionary system of determining challenges to the as applied constitutionality of the drug offense sentencing scheme will be far greater than is envisaged in the dissenting opinion. Inevitably, a system emphasizing the sentencing court’s findings and weighing of distinctive factors would lessen this Court’s role as the final, paramount arbiter of State constitutional issues. The dissenters’ readily understandable antipathy to the so-called "Rockefeller Drug Laws” should not becloud recognition that adoption of their proposed method of review would drastically change the role of this Court on challenges to the as applied constitutionality of legislation in general and even more radically alter the sound, principled cruel and unusual punishments jurisprudence which this Court has heretofore developed.
That is not to say that we disagree with the strongly held convictions of our dissenting colleagues and of the majority at the Appellate Division in the instant case (190 AD2d, at 166-167, supra) that the harsh mandatory treatment of drug offenders embodied in the 1973 legislation has failed to deter drug trafficking or control the epidemic of drug abuse in society, and has resulted in the incarceration of many offenders whose crimes arose out of their own addiction and for whom the cost of imprisonment would have been better spent on treatment and rehabilitation. The experience of the last two decades has clearly vindicated the doubts Chief Judge Breitel expressed in People v Broadie on the wisdom of the draconian drug sentencing laws. Nonetheless, even if the legislative choice was unwise, the central holding of Broadie still stands, namely, that the Legislature was not irrational in its view of the gravity of the offenses, the danger posed by the offenders and the penological purposes to be served and, therefore, the punishment imposed for defendant’s crime here *488 "in the present state of [our] knowledge [was] not grossly disproportionate or cruel and unusual in the constitutional sense” (People v Broadie, supra, at 118-119). Reform of the penological policy choices in combatting the drug scourge lies with the legislative, not the judicial, branch (see, Rummel v Estelle, 445 US 263, 283-284; id., at 282-284, nn 27-29; People v Broadie, supra, at 117 ["That courts may believe that the Legislature is mistaken, does not lessen the legislative power”]).
Accordingly, the order of the Appellate Division should be reversed, and the matter remitted to Supreme Court, New York County, for resentencing in accordance with this opinion.